# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 18, 2016 Session

## STATE OF TENNESSEE v. DAVID SCOTT HALL

**Appeal from the Criminal Court for Davidson County**
**No. 2010-D-3534    Monte Watkins, Judge**
_____

**No. M2015-02402-CCA-R3-CD – Filed May 2, 2017**
_____

The Appellant, David Scott Hall, was convicted in the Davidson County Criminal Court of attempted especially aggravated sexual exploitation of a minor, a Class C felony, and sentenced to four years to be served as one year in confinement and the remainder on supervised probation.  On appeal, the Appellant contends that the evidence is insufficient to support the conviction, that the trial court erred by allowing an expert witness to give irrelevant and highly prejudicial testimony, that he is entitled to coram nobis relief, that his right to a speedy trial was violated, that the trial court erred by allowing the State to introduce evidence without showing a proper chain of custody, that the trial court erred by allowing the State to play only a portion of a controlled telephone call to the Appellant, that the trial court erred by allowing the victim to testify about habit, that the trial court erred by allowing the State to introduce into evidence a letter supposedly written by the Appellant, and that the trial court erred by allowing the State to make improper closing arguments.  Based upon the oral arguments, the record, and the parties' briefs, we conclude that the evidence is sufficient to support the conviction, that the trial court erred by allowing a witnesses to give irrelevant testimony but that the error was harmless, that the Appellant is not entitled to coram nobis relief, and that his right to a speedy trial was not violated.  Finding no plain error as to the remaining issues, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, David Scott Hall.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

In December 2010, the Davidson County Grand Jury indicted the Appellant for attempted especially aggravated sexual exploitation of a minor. At the February 2015 bench trial, the eighteen-year-old victim testified that in May 2010, she was thirteen years old and lived in Nashville with her mother and sister, who was eighteen months younger than the victim. A flood had damaged their house, so the Appellant lived with them for a very brief time to help them paint and fix the garage. The victim said that the Appellant was "our second cousin" and acknowledged that he was "close" to the family.

The victim testified that she and her sister had separate bedrooms and that a bathroom was between their rooms. The Appellant slept upstairs in a loft, and he was not allowed in the victim's bedroom. However, he would come into her room occasionally to tell her it was time for dinner, ask her a question, or show her something. A fish tank was on a dresser in the victim's room. The victim and her sister usually fed the fish, but anyone who wanted to feed them could do so. The victim's weekday routine before school was to get out of bed, wake her sister, spend fifteen minutes in the shower, get dressed, and eat breakfast. While the Appellant was living with them, the victim would put on clothes immediately after her shower rather than walk from the bathroom to her bedroom wearing only a towel. The victim's bedroom was "not a very big room," and she would dress in an area between her dresser and her bed. The victim's mother always drove the victim and her sister to school.

The victim testified that May 18, 2010, was the last day of school before summer vacation. That morning, she got out of bed, took a shower, and returned to her bedroom. She then stated as follows:

> I noticed on my bed some clothes had been ruffled. I didn't remember them being that way when I had left.
>
> And then I looked over to where my folded clothes were on my dresser and I went over there to get some underwear. And when I had started looking through the clothes I saw a red dot and two little bra cup things. And a red dot. So I unveiled it and there was the camera.

The victim said that the red dot meant the camera was recording and that she recognized the camera as belonging to the Appellant.

The victim testified that she was surprised and picked up the camera, which no longer appeared to be recording. She showed the camera to her sister, and they watched a video on the camera. The video showed the victim entering her bedroom, "walking and rifling," and seeing the camera. The victim recognized the Appellant in the video. The State asked how she recognized him, and she answered, "His shirt, mostly. But just the frame of his figure. Like I could tell it was him." The girls took the camera to their mother and watched the video with her.

The victim testified that after the three of them watched the video, her mother had a conversation with the Appellant. The victim was not present for the conversation. As the girls and their mother were leaving for school that day, the Appellant was also leaving. He asked if he could go into the victim's bedroom to get his sunglasses case, but he was not allowed to do so. He did not live with them after May 18.

On cross-examination, the victim testified that she had known the Appellant since she was seven or eight years old. She acknowledged that it was "normal" for him to be at her home and that her mother trusted him. The Appellant had a pair of sunglasses, but the victim did not remember him leaving the sunglasses in her room on May 18. She acknowledged, though, that he asked to get his sunglasses case from her bedroom before he left that day. Defense counsel asked if one of the fish in the fish tank, a fish nicknamed "Barrack Obama" by the Appellant, belonged to the Appellant. The victim answered, "Maybe he did. I - that sounds a little familiar. I can't specifically remember it, but that - he might have, yeah. I don't think it was his fish, though. I don't think - I can't remember." She said she also did not remember the Appellant ever feeding any of the fish.

The victim testified that she, her sister, and the Appellant shared the same bathroom. The Appellant loved to travel and take photographs, and his camera was with him most of the time. The Appellant usually kept it in his pocket. The victim said that the Appellant was like an uncle to her, that she loved him, and that he never hurt her or made her feel uncomfortable.

On redirect examination, the victim testified that the Appellant usually would come downstairs while she and her sister were getting ready for school and that he would not have his camera with him. The victim did not see the Appellant's sunglasses case in her room on May 18.

Fifteen-year-old A.M.[1] testified that she was the victim's sister and was eleven years old in May 2010. The girls lived with their mother, and the Appellant stayed with them "on and off" for about a month to help after the flood. Their mother had a rule when a man was in the home that the girls had to be fully clothed when they came out of the bathroom. On May 18, the victim woke A.M. and went to take a shower. While the victim was in the shower, A.M. left her bedroom and saw the Appellant standing near the victim's bedroom and the bathroom. She said it was unusual for him to be there because "he would just usually sit on the couch or [be] eating." At some point, the victim brought the Appellant's camera to A.M. A.M. played a video on the camera, and the girls watched the video. A.M. said that she recognized the victim and the Appellant in the video and that she and the victim showed the video to their mother. On cross-examination, A.M. testified that she did not remember giving the Appellant his cellular telephone charger before she left for school on May 18.

E.M. testified that she was the mother of the victim and A.M. and that the Appellant was her second cousin. On the morning of May 18, 2010, the girls came into her bedroom and said they had found something. They were "quite excited" and "seemed upset." The girls and E.M. watched the video on the Appellant's camera twice. E.M. said that she tried "to keep it kind of calm because everybody was a little worked up" and that she told the girls to get ready for school.

E.M. testified that she went upstairs and asked the Appellant if he had been downstairs. The Appellant said he had been downstairs to the bathroom. She asked him if he had been in the victim's or A.M.'s bedroom, and he said no. E.M. told him that something had happened and that she needed him to leave the home. The Appellant got his belongings and went downstairs. E.M. said he had not been to her home since May 18.

E.M. testified that she dropped off the girls at school, took the camera to the police department, and spoke with a detective. At some point, she made a controlled telephone call to the Appellant in the presence of a female detective. The State played a portion of the call for the trial court. During the call, E.M. told the Appellant that she found a camera in the victim's bedroom and that it contained a video recording of the victim. E.M. asked how the camera got into the room and "set up" to record the victim. The Appellant said that he did not remember making the video but that he remembered going into the victim's room on May 18 to get his sunglasses. He said that he may have "set [the camera] down or something" but that he did not remember turning it on. E.M. told the Appellant that he was also on the recording, and he said, "I probably went in there and fed the fish. I was waiting to go to the bathroom." The Appellant told E.M. that he

---

[1]In order to protect the victim's identity, we will refer to her sister and her mother by their initials.

was "really embarrassed," that he was sorry the camera was in the victim's room, and that he "wasn't trying to do anything." The Appellant repeatedly maintained that he did not intend to record the victim.

On cross-examination, E.M. testified that the Appellant went on vacations with her family, that he babysat her children, and that she never had a problem with him. When E.M. asked the Appellant to leave on the morning of May 18, he did so. Before he left, he told her that he was looking for his sunglasses. E.M. went into the victim's bedroom, but the Appellant's sunglasses were not there. E.M. said that the Appellant may have named one of the fish in the fish tank but that he was not allowed to go into the victim's bedroom to feed the fish.

Detective Michael Adkins of the Metropolitan Nashville Police Department (MNPD) testified that he investigated this case and obtained a search warrant for the Appellant's camera. The warrant was executed, and a forensic examination of the camera was conducted. Detective Adkins was present for part of the examination and watched two videos from the camera's memory card. He then obtained a search warrant for the Appellant's residence, which was executed on June 9, 2010. During the search, officers seized computers and other devices. The Appellant agreed to speak with Detective Adkins, so they talked in the detective's van for about one hour.

On cross-examination, Detective Adkins acknowledged that he was searching the Appellant's residence for child pornography. He said his interview with the Appellant "got a little heated" but denied yelling at the Appellant for the entire hour. He acknowledged that he "hit the dashboard once or twice" and that he asked if the Appellant got a "hard on" from looking at photographs of young children. He also acknowledged that he did most of the talking and said that the Appellant "denied everything." Detective Adkins stated that he was trying to get the Appellant to admit the truth but that the Appellant "never would."

Detective Chad Gish of the MNPD testified as an expert in the forensic analysis of electronic devices that he inspected the Appellant's camera and removed the memory card. Detective Gish found two videos on the card. One video was "active." The other video had been deleted, but Detective Gish was able to recover it. He said the deleted video had been recorded before the active video and was of less duration than the active video. Detective Gish acknowledged that he received other evidence in this case and that he examined the evidence for child pornography. He did not find child pornography but found pornography.

The State played the two videos from the memory card for the jury. The first video, which was forty-two seconds in duration, showed a fish tank on the dresser and

then the camera being placed on the dresser beside the fish tank and turned toward the victim's bed. The second video, which was seven minutes in duration, again showed the fish tank, the camera being placed on the dresser, and the camera being turned toward the victim's bed. A person walked between the camera and the bed twice and left the room. About four minutes later, the victim entered the room, turned on the light, and walked to her bed. She was wearing a t-shirt and shorts, and her hair was wrapped in a towel. She turned toward the dresser, immediately went to the camera, and picked it up. At that point, the recording ended.

On cross-examination, Detective Gish testified that he also examined the Appellant's computer and cellular telephone. He reiterated that he did not find any child pornography on those devices.

The Appellant testified that he was fifty-five years old and that the victim was his third cousin. On the morning of May 18, 2010, he awoke and went downstairs to use the bathroom. He said he "possibly" had his camera with him because he was using the camera to document flood damage. The Appellant heard the alarm for his cellular telephone charger going off in the victim's bedroom, so he went into the room to check the charger. The victim had asked to borrow the charger in order to charge her own cellular telephone.

The Appellant testified that he looked at the fish in the fish tank and pulled out his camera to video-record the fish. Defense counsel asked why the Appellant wanted to record the fish, and the Appellant answered, "I take pictures and videos of lots of stuff, you know. I'm a photographer, just an amateur, you know. I take pictures of, you know, the river, you know, and stuff." He said he took the first video and was "trying to coax the fish out." The Appellant did not own any of the fish but had nicknamed one "Barack Obama." After he made the first video, he put the camera on the dresser and fed the fish. The Appellant said he often made two or three videos and kept the best one. He then deleted the first video because "there weren't as many fish . . . swimming around."

The Appellant testified that he made a second video of the fish, put his camera on the dresser, and fed the fish again "to coax [them] out and get them to swim around." At that point, he noticed that his sunglasses were in the victim's bedroom. He wondered what they were doing there and began "just nosing around, being nosey." He explained that he became distracted when he saw his sunglasses, that he forgot about the camera, and that the second video showed him "going through her stuff, nosing around." He did not know the victim's clothes were covering the camera. He said the camera was aimed toward the bedroom window, which was not something he would do intentionally because the light from the window would make the video dark. He denied entering the room with the intent to video-record the victim while she was changing clothes.

- 6 -

On cross-examination, the Appellant acknowledged that he had computer science degrees from Vanderbilt University and Middle Tennessee State University and that he was staying with the victim's family to help after the flood. He did not recall E.M. asking on May 18 if he had been in the girls' rooms and said she asked him to leave so the family could get ready for a school trip to Ohio. He acknowledged that he had seen the two videos many times and that he did not mention the cellular telephone charger in his controlled call with E.M. or in his conversation with Detective Adkins. He explained that "it didn't seem like a significant thing, it was something I remembered later," and he noted that the charger could be heard going off in the first video. The Appellant did not knock on the victim's bedroom door before he entered the room because the door was open, and he thought someone was in the bathroom but did not know if it was the victim. The Appellant said he did not turn on the bedroom light because light was shining through the window. He said he accidentally left his camera in the victim's room.

On redirect examination, the Appellant testified that E.M. made the controlled telephone call to him three weeks after the incident. During that three-week period, he did not know he had left his camera in the victim's bedroom and thought it was in the trunk of his car. On recross-examination, the Appellant testified that he received discovery for this case in the Fall of 2013 and subsequently sent a letter to Davidson County District Attorney General Torry Johnson. The State asked if he said anything in the letter about video-recording the fish, and the Appellant did not answer. The Appellant noted that he did not sign the letter.

The State introduced the four-page, typed letter to General Johnson into evidence. In the letter, the Appellant stated that during his telephone conversation with E.M., she confronted him about the camera being in the victim's bedroom and that he told her he probably went into the room to feed the fish. He then wrote as follows:

> [E.M.] and I went to a lot of trouble to clean the aquarium and take care of the fish in [the victim]'s room. [The victim]'s room was centrally located next to the living room. While I was in there, I found my prescription sunglasses. My sunglasses kept disappearing. When I found my sunglasses in [the victim]'s room, I looked around to see if she had any more of my stuff. I saw my cell phone charger plugged into [the victim]'s phone. I thought it was unusual that [the victim] had my sunglasses and cell phone charger. Why didn't she use her own cell phone charger?

> I was happy to find my sunglasses and I picked them up and left [the victim]'s room. I took my sunglasses upstairs so I could find them later. I don't remember leaving my camera in [the victim]'s room. If I did, it was unintentional. That's all I remembered 3 weeks later when they first told me about this. It was not significant enough to remember exactly what happened. The only reason I remember anything is because I found my sunglasses and cell phone charger in [the victim]'s room.

The Appellant did not sign the letter but concluded it by typing his name and telephone number.

Immediately after the close of proof, the trial court found the Appellant guilty as charged of attempted especially aggravated sexual exploitation of a minor, a Class C felony. After a sentencing hearing, the court sentenced him to four years to be served as one year in confinement and the remainder on supervised probation.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support the conviction because no "lacivious exhibition" occurred in this case. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the general standard of review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). Accordingly, in a bench trial, the trial judge, as the trier of fact, must resolve all questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence. <u>State v. Ball</u>, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). The trial judge's verdict carries the same weight as a jury verdict. <u>State v. Hatchett</u>, 560 S.W.2d 627, 630 (Tenn. 1978).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The [trier of fact] decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the [trier of fact].'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-12-101 provides:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

The Tennessee Protection of Children Against Sexual Exploitation Act of 1990 criminalizes the possession, distribution, and production of child pornography. State v. Whited, 506 S.W.3d 416, 427 (Tenn. 2016). As charged in this case, especially aggravated sexual exploitation of a minor occurs when a person knowingly uses a minor "to participate in the performance of, or in the production of, . . . material that includes

the minor engaging in . . . [s]exual activity." Tenn. Code Ann. § 39-17-1005(a)(1). "Sexual activity" is defined as

> (A) Vaginal, anal or oral intercourse, whether done with another person or an animal;
>
> (B) Masturbation, whether done alone or with another human or an animal;
>
> (C) Patently offensive, as determined by contemporary community standards, physical contact with or touching of a person's clothed or unclothed genitals, pubic area, buttocks or breasts in an act of apparent sexual stimulation or sexual abuse;
>
> (D) Sadomasochistic abuse, including flagellation, torture, physical restraint, domination or subordination by or upon a person for the purpose of sexual gratification of any person;
>
> (E) The insertion of any part of a person's body or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure by a licensed professional;
>
> (F) Patently offensive, as determined by contemporary community standards, conduct, representations, depictions or descriptions of excretory functions; or
>
> (G) Lascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person.

Tenn. Code Ann. § 39-17-1002(8). As noted by the Appellant, the only definition of "sexual activity" arguably applicable to this case would be subsection (G), whether the video attempted to depict the minor victim engaged in the "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person." Tenn. Code Ann. § 39-17-1002(8)(G).

Our supreme court recently addressed the meaning of "lascivious." In Whited, the defendant was convicted of nine counts of especially aggravated sexual exploitation of a minor after he hid his cellular telephone in a bathroom and bedroom used by his twelve-

- 10 -

year-old daughter and secretly videotaped her and a fourteen-year-old friend in various stages of undress.  506 S.W.3d at 419.  Although all of the videos depicted the girls in "varying degrees" of nudity, the defendant argued that the evidence was insufficient to support the convictions because the videos did not depict "sexual activity."  Id. at 425, 442.

The supreme court first addressed the standard of review and found that the determination of whether the depictions in the videos were legally sufficient to support a finding that the girls engaged in "lascivious exhibition" was primarily an issue of law subject to de novo review but that the State was entitled to the strongest legitimate view of the evidence regarding any disputed facts.  Id. at 427.  The court then turned to whether the evidence was sufficient to show that the videos depicted lascivious exhibition.

"[M]ere nudity, without more, is insufficient to establish a lascivious exhibition of private body areas."  Id. at 431.  In determining whether conduct involves mere nudity or lascivious exhibition, the court specifically rejected this court's use of the six "Dost factors"[2] as a "'test'" or "analytical framework."  Id. at 437.  Instead, judges should use

---

[2] In Dost, the United States District Court for the Southern District of California held that in determining whether a visual depiction of a minor constituted a "lascivious exhibition of the genitals or pubic area" under federal law, the trier of fact should consider the following factors:

> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
>
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> 4) whether the child is fully or partially clothed, or nude;
>
> 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
>
> 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986).

their good sense to consider [the Dost factors] or any other features of a depiction that might tend to make it sexual or lascivious. Indeed, . . . in assessing the lasciviousness of the videos . . . , this Court considers ordinary characteristics, such as the minor victims' nudity and whether the children's private body areas are featured in the videos.

Id. at 437-38. Moreover, because the offense of especially aggravated sexual exploitation of a minor does not include the defendant's intent or purpose of sexual arousal or gratification as an element of the offense, the material at issue must be evaluated based on what is depicted without reference to the defendant's subjective intent. Id. at 441.

To determine whether the videos depicted "lascivious exhibition" in Whited, our supreme court considered

the level and nature of the nudity in the videos, the emphasis on the minor victims' private body areas, the fact that the victims were engaged in everyday activities ordinarily performed nude, the defendant's audible comments and interactions with the victims recorded on the videos, and the defendant's recorded actions depicting his voyeurism in setting up the camera.

Id. at 447. Although the court characterized the issue as "close," it held that the evidence was insufficient to support any of the convictions because the minors in the videos were engaged in activities that were appropriate for the settings in which the videos were recorded and were not sexual or lascivious within the ordinary meaning of those terms. Id. However, the court noted that the State could retry the defendant on the lesser-included offense of attempted especially aggravated sexual exploitation of a minor, stating,

The defendant in this case was convicted of producing child pornography; the jury was not instructed on the lesser-included offense of attempt on those counts. Our conclusion that the defendant did not produce material that is sufficient to support a conviction for the production of child pornography under the child sexual exploitation statutes "is not tantamount to a finding of insufficiency on" attempt. The facts in this case present a close question regarding whether the defendant intended to capture exactly what he recorded in the videos—minors engaged in everyday activities ordinarily

- 12 -

done nude—or whether he intended to "cause a result that would constitute the offense" of production of child pornography by recording the minors engaged in a lascivious exhibition. Tenn. Code Ann. § 39-12-101(3). Considering the entirety of the record, "the evidence in the record is not so insufficient" so as to preclude a finding of attempted production of child pornography.

Id. at 448 (case citations omitted).

Taken in the light most favorable to the State, the evidence in the instant case establishes that the victim's routine before school was to take a shower, return to her bedroom, and dress in an area between her dresser and her bed. On the morning of May 18, 2010, the Appellant went into the victim's bedroom while she was taking a shower. He put his camera on the dresser, turned it toward the area in which the victim would change clothes, and made the first video as a test. He then deleted the video and returned the camera to its previous location on the dresser. He tried to conceal the camera, walked to the victim's bed twice, and ruffled through her clothes. The Appellant left the bedroom, and the camera sat idly recording the dark room for four minutes until the victim entered the bedroom and turned on the light. She walked toward her bed and into the exact area the camera was recording. She turned toward her dresser and saw the camera.

In considering whether the Appellant attempted to record lascivious exhibition of the victim's private body areas, the evidence shows that, had the victim not found the camera, it would have recorded her bare breasts, pubic area, and buttocks while she engaged in the everyday activity of dressing after showering. She was not posed or coached for the video, and there were no audible comments or interactions between the victim and the Appellant in the video. However, we believe the depiction of "a middle-age man secreting a camera to record" the victim, which also occurred in Whited, and his walking to her bed "portray[ed] voyeurism and suggest[ed] a sexual connotation for the minor's engagement in everyday activities ordinarily done in the nude and in private." Id. at 446. Moreover, due to the small size of the room and the short distance between the dresser and the bed, the focal point of the video would have been the victim's private areas. Thus, we conclude that the evidence was sufficient for the trier of fact to conclude that the Appellant attempted to produce child pornography by recording the victim in a lascivious exhibition. Accordingly, the evidence is sufficient to support the conviction of attempted especially aggravated sexual exploitation of a minor.

B. Detective Gish's Testimony

The Appellant contends that the trial court erred by allowing Detective Gish to testify that he found adult pornography on electronic devices seized during the search of the Appellant's home because the testimony was irrelevant. He also claims that, in any event, the testimony was highly prejudicial and that Detective Gish was not qualified as an expert to give such testimony. The State argues that even if the trial court erred, the error was harmless. We conclude that the testimony was irrelevant but that the error was harmless.

Before Detective Gish's testimony, defense counsel agreed to stipulate that the officer was an expert in the forensic analysis of electronic devices. During direct examination, Detective Gish testified that he worked in the MNPD's Surveillance and Investigative Support Unit and that he examined the memory card from the Appellant's camera. He also examined other electronic devices seized during the search of the Appellant's home. The State asked if the detective found any child pornography on those devices, and he said no. The State then asked if he found any pornography, and he answered, "I did." Defense counsel objected based upon relevance and "also the implication. He's up here testifying he found legal material but they want to label it pornography, Your Honor." The trial court noted that Detective Gish was testifying as an expert, but defense counsel pointed out that the detective was testifying as an expert in forensic analysis, not "the standards of what's acceptable and not acceptable photographs." Defense counsel requested that the State show the trial court the photographs Detective Gish considered pornographic. The trial court asked if the State was going to enter the photographs as exhibits, and the State said no. The State again asked if Detective Gish found any pornography on the Appellant's computer, and he answered, "Yes, but not child pornography." The State asked for a third time, "Okay. But there was pornography?" The detective answered, "Yes, there was some." Defense counsel objected on the basis that the question had been asked and answered. The trial court did not rule on the objection.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible. See Tenn. R. Evid. 404(b). The Rule also provides, though, that evidence of other bad acts may be admissible for other purposes, such as "'to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant

issue.'" State v. Moore, 6 S.W.3d 235, 239 n.5 (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)).

Before a trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Although an adult's use of pornography is legal, unless it is obscene or child pornography, it has "such prejudicial potential" that its admissibility is governed by Tennessee Rule of Evidence 404(b). State v. Clark, 452 S.W.3d 268, 289 & fn.10 (Tenn. 2014). As our supreme court has explained, "Caution is especially warranted in trials for sex crimes because a jury may infer from a defendant's use of pornography that the defendant had the propensity to engage in other morally questionable sexual behaviors." Id. Moreover, such "propensity evidence is especially harmful in close cases, such as those that hinge on the credibility of the witnesses[.]" Id. at 290.

Turning to the instant case, we initially note that the State claims the Appellant has failed to preserve this issue because he did not include the transcript of the motion for new trial in the appellate record. The record reflects that the Appellant filed a motion for new trial, that the trial court held a hearing on the motion, and that the trial court denied the motion. The Appellant was not required to file a motion for new trial because the trial was a bench trial. See Tenn. R. App. P. 3(e) (providing that prior to initiating an

appeal as of right, defendants must file a motion for new trial "in all cases tried by a jury"). Nevertheless, given that he did so and that the trial court held a hearing on the motion, the Appellant should have included the transcript of the hearing in the appellate record. See Tenn. R. App. P. 24(b) (providing that it is the appellant's duty to prepare a record which conveys a fair, accurate, and complete record on appeal to enable meaningful appellate review). However, our supreme court has determined that a record may be sufficient for our review despite the absence of a relevant transcript. See State v. Caudle, 388 S.W.3d 273, 277 (Tenn. 2012). We believe the record is adequate for our review of this issue.

The State offered no explanation at trial as to why the Appellant's possessing adult pornography was relevant to this case and acknowledges on appeal that the evidence was irrelevant, stating in its brief that "the State did not establish any connection between the pornography found on the computer and the facts of this case." Thus, we agree with the Appellant that Detective Gish's testimony about finding pornography was not relevant and that the trial court should have sustained the Appellant's first objection.

Next, we must determine whether the error was harmless. Clark, 452 S.W.3d at 287 (citing Tenn. R. App. P. 36(b)). We are perplexed that the State continued to ask the witness if he found adult pornography when he had already answered the question in the affirmative, and we believe the State was attempting to use the evidence as propensity evidence. That said, the outcome of this case did not "hinge" on the trier of fact's assessment of the credibility of the victim and the Appellant. Id. at 290. Instead, it hinged greatly upon the videos.

The Appellant testified at trial that he was video-recording the fish, not the victim. However, both of the videos belie that contention, showing the fish tank for only a few seconds before the Appellant turned the camera toward the victim's bed, put the camera on the dresser, and adjusted the camera. Although the Appellant said that he became distracted by his unexpectedly finding his sunglasses in the room and that he forgot about the camera, nothing in the second video indicates that he found his sunglasses there. In short, the videos did not support the Appellant's explanation at trial for making the videos.

Moreover, although the Appellant testified that he first entered the room because he heard his cellular telephone charger going off, he never mentioned the charger in his controlled call with E.M. or in his conversation with Detective Adkins. In his letter to the district attorney general, he claimed that he went into the room to get his sunglasses, looked around to see if the victim had more of his property, and found his charger plugged into her cellular telephone. The Appellant also failed to mention in the letter that he was recording the fish. During the State's cross-examination of the Appellant, it

pointed out discrepancies in his testimony, the controlled call, and the letter, and those discrepancies greatly undermined his credibility. Thus, even though the trial court erred by allowing Detective Gish to testify that he found adult pornography on other devices, we do not believe that testimony changed the outcome of this case.

## C. Error Coram Nobis

The Appellant contends that the trial court erred by denying his petition for a writ of error coram nobis based upon newly discovered evidence. The State argues that the trial court properly denied the petition. We agree with the State.

Almost seven months after the trial court sentenced the Appellant, he filed a petition for a writ of error coram nobis. In the petition, he alleged that he was entitled to relief based upon newly discovered evidence. He asserted that he was denied access to his computer, which was seized during the search of his home, until he was released from confinement in January 2016. At that point, the MNPD returned his computer to him, and he discovered that it contained photographs and video of fish and fish tanks, which would have supported his testimony that he was recording the fish on May 18, 2010.

At a hearing on the petition, the Appellant testified that he had transferred photographs and video-recordings from his camera's memory card to his computer's hard drive for storage and to "free up" space on the memory card. During the search of his home in 2010, officers seized the computer and did not return it to him until he was released from confinement in January 2016. When the Appellant received the computer, he reviewed the stored media and found "videos of aquariums that [he] had taken prior to being arrested." He also found photographs of the fish tank the victim's family had owned when they lived in California in 2004 and photographs of him and the girls "hanging out" in their bedrooms, which contradicted their trial testimony that he was not allowed in their rooms. The Appellant introduced into evidence a DVD containing photographs and videos allegedly taken from his computer hard drive.

On cross-examination, the Appellant acknowledged that he took all of the photographs and recorded all of the videos that were stored in his computer's hard drive but said that "it's one of those things that you wouldn't necessarily remember every single picture you have taken over the past five or ten years." The Appellant did not ask his attorney to obtain the hard drive before trial because the photographs and videos did not "cross [his] mind."

In a written order, the trial court denied the petition, stating that "the defendant/petitioner has not met his burden and that the presentation of said evidence at trial would not have altered the verdict." On appeal, the Appellant maintains that he is

entitled to coram nobis relief based upon the newly discovered photographs and video and that the trial court applied an incorrect standard of review by considering whether the new evidence "would have" resulted in a different judgment instead of the statutorily mandated "may have" standard.

The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105 and provides as follows:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith . . . . Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007). The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999).

Our supreme court has outlined the procedure that a court considering a petition for a writ of error coram nobis is to follow:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the

coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)).

Regarding the Appellant's claim that the trial court applied the incorrect standard of review, the trial court's order denying relief was brief, consisting mostly of the Appellant's allegations for relief. The court then wrote as follows:

> The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court, Ricky Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). After careful review of the testimony at the hearing, arguments of respective counsel as well as a review of the photographs and videos, the Court is of the opinion that the defendant/petitioner has not met his burden and that the presentation of said evidence at trial would not have altered the verdict.

Although the coram nobis court appeared to use the wrong standard, the photographs and videos from the hard drive do not constitute "newly discovered evidence." Nothing indicates that the computer hard drive was unavailable to the Appellant before trial. Instead, the Appellant, who took the photographs, recorded the videos, and then transferred the photographs and videos to the computer, did not think to have his attorney ask for the hard drive. Accordingly, he is not entitled to relief.

### F. Speedy Trial

The Appellant contends that his right to a speedy trial was violated because he was not tried for "well over four years" after he was indicted, his case was reset for trial at least twice through no fault of his own, and he was prejudiced by the delay because he was unable to recall with specificity the events of May 18, 2010. The State argues that the Appellant's right to a speedy trial was not violated. We agree with the State.

"The right to a speedy trial arises under the Sixth Amendment to the Constitution of the United States made applicable to the State by the Fourteenth Amendment . . . and Article 1, § 9 of the Constitution of Tennessee." State v. Bishop, 493 S.W.2d 81, 83

(Tenn. 1973). To determine whether a defendant's constitutional right to a speedy trial has been violated this court must conduct the balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972). See State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996); State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981). Under the Barker analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. 407 U.S. at 530.

The State again argues the Appellant has waived this issue because he failed to include the transcript for the motion for new trial in the appellate record. We again conclude, though, that the record is adequate for our review. See Caudle, 388 S.W.3d at 277. The State also argues that the Appellant has waived the issue because he failed to request a speedy trial in a pretrial motion to dismiss. However, "the failure to demand a speedy trial is not a waiver of the right, but is one of the factors to be considered in the ultimate decision." State v. Bishop, 493 S.W.2d 81, 85 (Tenn. 1973).

"The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997). In this case, the Appellant was indicted on December 14, 2010, and his trial commenced on February 2, 2015, resulting in a delay of more than four years. A delay of one year or longer will usually trigger an inquiry into a speedy trial violation. Id. In Vickers, this court found that a delay of three years and nine months was not a presumptive speedy trial violation. Id. Therefore, we must examine the other factors involved.

The second factor, the reason for delay, generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47. The Appellant asserted in his amended motion for new trial that the delay "was caused by delays in providing discovery to [him]" and asserts in his appellate brief that "the State delayed the trial." However, nothing in the record supports those claims. Thus, this factor weighs against the Appellant.

Regarding the third factor, the Appellant's assertion of his right to a speedy trial, nothing indicates that the Appellant ever requested a speedy trial. "Failure to assert the right implies a defendant does not actively seek a swift trial." Id. at 347. Therefore, this factor also weighs against him.

Finally, we must determine whether the Appellant was prejudiced by the delay, which is the "final and most important factor in the [speedy trial] analysis." State v. Simmons, 54 S.W.3d 755, 760 (Tenn. 2001). Prejudice is to be assessed in light of the following interests of the accused which the right to a speedy trial was designed to protect: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize the anxiety and concern that result from being accused of a crime; and (3) to limit the risk that the defense will be impaired. State v. Simmons, 54 S.W.3d 755, 760 (Tenn. 2001). Here, the Appellant does not contend that he was oppressively incarcerated before trial. To the contrary, he states in his brief that he "was on bond the entire time." He also does not claim that he suffered from anxiety and concern but asserts that the delay impaired his ability to prepare a defense because he could not remember the specific events of May 18, 2010. However, E.M. confronted the Appellant about his recording the victim just three weeks after the event, and Detective Adkins questioned him and executed a search warrant on his home on June 9, 2010. Therefore, the Appellant was well-aware shortly after May 18, 2010, that he could be charged with committing a crime on that date. Furthermore, he testified at trial that the two videos helped him remember what happened on May 18, and his testimony was quite detailed as to why he went into the victim's room and how the recordings occurred. Thus, we believe the prejudice caused by the delay was, at most, minimal and does not weigh in favor of a speedy trial violation.

In sum, the length of the delay weighs in favor of a speedy trial violation, but the other three factors do not. Accordingly, the Appellant is not entitled to relief.

F. Remaining Issues and Plain Error

In addition to the issues discussed above, the Appellant contends that the trial court improperly allowed the State to introduce his camera, memory card, and videos into evidence without showing a proper chain of custody; that the trial court erred by allowing the State to play only a portion of E.M.'s controlled telephone call; that the State improperly introduced irrelevant habit evidence; that the trial court improperly allowed the State to introduce into evidence the letter supposedly written by the Appellant to the district attorney general; and that the trial court erred by allowing the State to make improper closing arguments. However, he did not object to any of the evidence or the State's arguments at trial. See Tenn. R. App. P. 36(a) (nothing in the rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error).

The Appellant requests that we review these issues for plain error. We may consider an issue as plain error when all five of the following factors are met:

- 21 -

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also Tenn. R. App. P. 36(b). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Id. at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). It is the Appellant's burden to demonstrate plain error. State v. Gomez, 239 S.W.3d 722, 727 (Tenn. 2007). Moreover, we do not need to consider all five factors if we determine that a single factor does not warrant relief. State v. Smith, 24, S.W.3d 274, 283 (Tenn. 2000).

Regarding the chain of custody for the camera, memory card, and videos, it is "'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting State v. Holbrooks, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998)). The victim identified the camera she found on May 18, 2010, and Detective Gish identified the memory card he removed from the camera and the videos he found on the card. Thus, a clear and unequivocal rule of law was not breached.

Regarding the State's playing only a portion of E.M.'s controlled call, the Appellant claims that Tennessee Rule of Evidence 106, the "rule of completeness," required the playing of the entire call because the entire conversation "shows Mr. Hall not only denying any wrongdoing regarding the alleged victim, but is similarly unfamiliar with the exact incident that [E.M.] is discussing." However, in the portion played by the State, the Appellant repeatedly told her that he did not remember making the video and that he did not record the victim intentionally. Thus, playing the entire call probably would not have changed the outcome of trial. Moreover, we are not convinced that the Petitioner did not waive this issue for tactical reasons.

As to the Appellant's claim that the State introduced irrelevant habit evidence, Tennessee Rule of Evidence 406 allows evidence of habit to prove that a person's conduct on a particular occasion was in conformity with the habit. Habit "is a regular response to a repeated specific situation." Tenn. R. Evid. 406(b). In this case, the State asked the victim to describe her "habit" of getting ready for school, and the victim explained her morning routine. The State then had the victim describe the events of May 18. During cross-examination of the Appellant, the State asked if he was "used to the

way that the household operates," the implication being that the Appellant was familiar with the victim's morning routine and, therefore, knew of an opportunity to record her changing clothes. The Appellant answered, "I suppose." We note that "Rule 406 admits evidence that would probably be admitted anyway under the general relevance principles embraced in Rule 401." Neil P. Cohen et al., Tennessee Law of Evidence, § 4.06[2] (6th ed. 2011); see Tenn. R. Evid. 401. We believe the victim's testimony about her morning routine was relevant habit evidence.

As to the letter written to the district attorney general, the Appellant contends that the State failed to establish that he wrote the letter; that the trial court improperly allowed the State to refresh his recollection with the letter pursuant to Tennessee Rule of Evidence 612; and that the trial court improperly allowed the State to introduce the entire letter, over the Appellant's objection, into evidence under Rule 612. We find no merit to these claims.

During recross-examination of the Appellant, the State asked if he remembered sending a letter to District Attorney General Torry Johnson. The Appellant did not deny writing the letter but instead answered, "I got to read it." The State replied that either he remembered the letter or not, and the Appellant stated, "I sent a letter to Torry Johnson." The State then asked, "Right. And in this letter you never say anything about videotaping the fish, do you, sir?" The Appellant said he did not remember the letter, so the State showed the letter to him. Defense counsel objected, stating, "If she's going to refresh his recollection we would request that she use the proper form, Judge." The trial court replied, "He said he didn't remember. She's showing him the letter." After the State showed the letter to the Appellant, it asked him twice if the letter said anything about recording fish, but the Appellant would not answer. The State then introduced the letter into evidence without any objection by the Appellant. However, the Appellant stated, "I didn't sign that, so I . . . ."

The Appellant never claimed at trial, and does not claim on appeal, that he did not write the letter. Indeed, the Appellant admitted sending a letter to the district attorney general. When the State showed the letter to him, he did not deny writing it and said he did not sign it. Regarding the State's using the letter to refresh his memory, Tennessee Rule of Evidence 612 generally allows a witness to use a writing while testifying to refresh the witness's recollection. When the State asked if the Appellant said anything in the letter about recording fish, the Appellant said he did not remember the letter, so the trial court properly allowed the State to refresh his memory with the letter pursuant to the Rule. Although the entire letter was not admissible under that Rule, it was admissible pursuant to the hearsay exception set forth in Tennessee Rule of Evidence Rule 803(1.2)(A), an admission by a party-opponent.

- 23 -

Finally, the Appellant contends that the State gave improper closing arguments. First, he claims that the prosecutor misstated the facts by telling the trial court that the girls had established a morning routine for their activities, by telling the court that the Appellant admitted to being the other party in the video when he did not give such testimony, by stating that the videos did not show the fish tank when they did show the tank, and by stating that the Appellant deleted the first video in order to get a better angle of the victim when no such testimony was in the record. However, the victim and her sister both testified about their morning routines; the Appellant admitted to recording both videos and even said the second video showed him "nosing around" the victim's room; and both videos showed the fish tank for only a few seconds despite the Appellant's claim that he went into the room to record the fish. Therefore, the prosecutor did not misstate the evidence. Moreover, the prosecutor's arguing that the Appellant deleted the first video and used the second video to get a better angle of the victim was a reasonable inference given the facts. Therefore, we find nothing improper about the State's argument.

The Appellant also contends that the prosecutor's closing arguments were improper because she said that the Appellant "thinks we're stupid enough to buy that bull that comes out of his mouth" and "thinks that he is so smart . . . he can get up here and bulldoze and B.S. his way through all the B.S. that he said." The State acknowledges that the prosecutor's comments may have been improper. As we have repeatedly stated, it is improper for a prosecutor to express his or her personal opinion on the evidence or a defendant's guilt or use arguments calculated to inflame the passions or prejudices of the jury. State v. Goltz, 111 S.W3d 1, 6 (Tenn. Crim. App. 2003). In this case, though, the closing arguments were made to a judge in a bench trial as opposed to a jury. We believe a judge, who is fully informed about the law and the facts of a case, is less likely to be influenced by improper statements made during closing arguments than a jury. See State v. Donald Joseph Powell, No. M2014-01132-CCA-R3-CD, 2015 WL 3563106, at *9 (Tenn. Crim. App. at Nashville, June 8, 2015) (stating that "in a bench trial, the judge is presumed to follow the law and to not consider improper evidence); see also Glenn Davis v. Charles Bowers, No. E2011-00295-COA-R3-CV, 2012 WL 762442, at *13 (Tenn. Ct. App. Mar. 9, 2012) (stating that "a trial court is well qualified to determine what weight, if any, should be given to evidence," and, therefore, that the risk of harm for improperly admitted evidence is less in a bench trial than in a jury trial). In any event, given the evidence, we do not believe the prosecutor's statements were so egregious as to constitute plain error. Accordingly, the Appellant is not entitled to relief.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE